**UNITED STATES of America, Plaintiff**

v.

**David MEYERS, Defendant.**

**No. 95–CR–0058–B.**

United States District Court, D. Wyoming.

Nov. 14, 1995.

---

Patrick J. Crank, Assistant U.S. Attorney (WY), Casper, WY, for Plaintiff.

Thomas B. Jubin, Cheyenne, WY, for Defendant.

### ORDER ON MEYERS' RELIGION DEFENSE

BRIMMER, District Judge.

The United States charged Meyers with two offenses stemming from marijuana possession and trafficking. Meyers asserts that the United States cannot prosecute him for these crimes because, as a "Reverend" of the "Church of Marijuana," his possession and distribution of marijuana is legally protected religious conduct.

The delicate issue before the Court is whether the "Church of Marijuana" is a bona fide religion that triggers the protections of the Religious Freedom Restoration Act ("RFRA"). 42 U.S.C. § 2000bb et seq. Because this issue implicates the constitutional guarantee of religious freedom, the Court begins with an overview of the First Amendment's "free exercise" clause.

## I. THE "FREE EXERCISE" OF RELIGION

Starkly and majestically, the First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." These words, cornerstones of American liberty, seem simple enough. So simple, in fact, that they have been reduced to shibboleths that mask their complexity. Because First Amendment slogans such as "the wall between church and state" and "religious freedom" have become so ingrained in the lay and legal vernacular it is appropriate to ask: What does it mean to assert that Congress cannot prohibit the "free exercise" of religion? The Court answers this question by beginning where it should, with the language of the amendment.

Because the word "exercise" connotes action, it is reasonable to assume at step one that the First Amendment protects the right to engage in religious acts. Though this is qualifiedly true, it overlooks the precursor to such action: religious belief. To the extent that a religious act is undertaken with volition and deliberation, it is impelled or caused by thought or belief. Thus, "free exercise" of religion includes, at a minimum, freedom of religious thought or belief. One might say, therefore, that the First Amendment's "free exercise" guarantee sets a floor on religious freedom; the floor is religious belief and Congress cannot drop below the floor by enacting laws that in any way interfere with or restrict such belief. This is a concept, based on liberty and tolerance, with which most of us would agree.

In its most obvious sense, however, "exercise" implies action. Thus, if the First Amendment's "free exercise" clause were taken literally, it would mean that Congress cannot enact laws which in any way interfere with or restrict a person's religious actions. This is a concept, also based on liberty and tolerance, that might cause the thoughtful among us to pause. This pause might cause us to conclude that anarchy and chaos would reign if citizens could justify any act or undertaking in the name of religious freedom.

With this in mind, the Supreme Court has recognized that religious freedom, as manifest in religious action, cannot be absolute in a country founded on the rule of law. This recognition means, of course, that the First Amendment cannot quite mean what it literally says:

> [T]he Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.

*Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). This does not mean, however, that government can regulate all religious conduct.[1] As the Supreme Court put it in *Cantwell,* "[i]n every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." *Id.* at 304, 60 S.Ct. at 903. Not surprisingly, the contours of "undue infringement" on religious freedom have changed with the ebb of circumstance and flow of history.

In practice, government's power to regulate religious freedom usually has meant that if government enacts "neutral laws of general applicability"—i.e., laws not directed toward a particular religious practice or group—the law may incidentally impair religious action. Thus, in an easy case, laws against murder may prohibit religiously motivated killing. In another easy case, laws against assault may prohibit religiously impelled physical attacks. The cases are not, however, always so easy.

Things become more difficult when laws against polygamy regulate religious freedom by prohibiting Mormons from marrying more than one wife. *Reynolds v. United States,* 98 U.S. (8 Otto) 145, 25 L.Ed. 244 (1878). The case is also more difficult when child labor laws curtail religious freedom by prohibiting young Jehovah's Witnesses from selling reli-

---

**1.** "Congress shall make no law" came to mean also that the states "shall make no law" when, in *Cantwell,* the Supreme Court held that First Amendment religious freedoms are embedded in the Fourteenth Amendment's guarantee of "liberty" and therefore apply to the states. 310 U.S. at 303, 60 S.Ct. at 903.

gious magazines. *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). Similar difficulties arise when child abuse laws impinge on religious freedom by forcing Christian Science parents to take their ailing children to doctors. *Lundman v. McKown,* 530 N.W.2d 807 (Minn.Ct.App. 1995); *People v. Rippberger,* 231 Cal.App.3d 1667, 283 Cal.Rptr. 111 (Cal.Ct.App.1991); *see also Sherr v. Northport–East,* 672 F.Supp. 81, 90 (E.D.N.Y.1987) (mandatory immunization law impairs pantheist's religious freedom). It is also a hard case when laws against animal abuse interfere with religious freedom by prohibiting religiously prescribed animal sacrifice. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

As one might expect, some of the hard cases have led to exceptions, or special dispensations, that the Court bestows upon deserving (i.e., sympathetic) religious groups and practices. Thus, the Supreme Court has not always upheld neutral laws of general applicability when they "forbid one to do that which one's religion commands," or when they "command one to do that which is forbidden by one's religion." W. Van Alstyne, *First Amendment* 1053 (2d ed. 1995). In *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court held that a state law requiring all children under the age of 16 to attend public or private schools impermissibly infringed on the Amish religious belief in home schooling. Some state courts, apparently taking their cue from *Yoder,* have held that drug laws forbidding the use of hallucinogens impermissibly infringes on the Native American Church's use of peyote during religious ceremonies. *State v. Whittingham,* 19 Ariz.App. 27, 504 P.2d 950 (Ariz.Ct.App.1973); *Whitehorn v. State,* 561 P.2d 539 (Okla.Ct.Crim. App.1977).

Though the courts rarely acknowledged it, this exception making usually amounted to an implicit evaluation of the religion's bona fides and to an explicit balancing of the law and practice at issue. *See Yoder,* 406 U.S. at 235–36, 92 S.Ct. at 1543–44. Thus, under the *Yoder* regime, a court might well grant a "free exercise" exception to an otherwise illegal religious practice if: (1) the religion was of a respectable vintage; (2) it was recognized as a legitimate faith; (3) the beliefs were sincerely held; (4) the practice which was proscribed by law did not cause others any direct harm; and (5) uniform application of the law was not essential to maintaining public order. *Id.* In other words, under *Cantwell, Yoder,* and their progeny, courts could—when confronted with hard cases involving sympathetic parties engaged in innocuous religious activities—balance religious and social interests. *See also Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (applying compelling interest test to state law infringing on religious freedom).

Unwilling or unable to work with the discretion and ambiguity that such an approach requires, this specialized exception making came to an abrupt end in 1990 with the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith,* the Court rejected the *Yoder* balancing test and held, unequivocally, that neutral laws of general applicability are not subject to free exercise challenges. 494 U.S. at 885–90, 110 S.Ct. at 1603–06. Explaining its decision to dispense with "balancing" and "strict scrutiny" when confronted with a free exercise challenge to a neutral law of general applicability, the Court observed:

> Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities.

*Id.* at 879, 110 S.Ct. at 1600 (quoting *Minersville School Dist. Bd. of Ed. v. Gobitis,* 310 U.S. 586, 594–95, 60 S.Ct. 1010, 1013, 84 L.Ed. 1375 (1940)). In closing, Justice Scalia recognized that the Court's decision essentially subjected free religious exercise to the vagaries of political accommodation, and concluded that this "unavoidable consequence of

democratic government must be preferred to a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs." *Id.* 494 U.S. at 890, 110 S.Ct. at 1606.

Congressional reaction to the changing of the free exercise guard in *Smith* was relatively swift. Accepting Justice Scalia's invitation to legislate religious accommodation, Congress did so with ironic vengeance by repudiating the *Smith* decision and specifically reviving the balancing test:

> [I]n *Employment Division v. Smith,* 494 U.S. 872 [110 S.Ct. 1595, 108 L.Ed.2d 876] (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion. [T]he compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

42 U.S.C. § 2000bb(a)(4)–(5). The Religious Freedom Restoration Act therefore restores "the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398 [83 S.Ct. 1790, 10 L.Ed.2d 965] (1963) and *Wisconsin v. Yoder,* 406 U.S. 205 [92 S.Ct. 1526, 32 L.Ed.2d 15] (1972)," and provides a "defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b)(1)–(2). Under RFRA, government may substantially burden a person's exercise of religion only if it demonstrates that the burden (i.e., the law at issue, even if neutral and general): (1) furthers a compelling governmental interest; and (2) is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1(b)(1)–(2).

Though there are questions about RFRA's constitutionality, *compare Sasnett v. Department of Corrections,* 891 F.Supp. 1305, 1320 (W.D.Wis.1995) (RFRA is constitutional) *with Flores v. City of Boerne,* 877 F.Supp. 355, 358 (W.D.Tx.1995) (RFRA is unconstitutional), that issue is not before the Court. Moreover, the Tenth Circuit recently dis-

cussed and relied on RFRA without raising any questions about its constitutionality. *Werner v. McCotter,* 49 F.3d 1476, 1479 (10th Cir.1995), *cert. denied,* —— U.S. ——, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995). Until the Tenth Circuit or Supreme Court decides otherwise, this Court will presume that RFRA is constitutional.

This is, therefore, the free exercise landscape which underlies Meyers' assertion that he cannot be prosecuted under federal drug laws because those laws substantially burden his RFRA-based right to possess and distribute marijuana for religious purposes.

## II. THE DEFINITION OF "RELIGION" UNDER RFRA

■ Meyers cannot simply raise a RFRA defense by asserting that his possession and use of marijuana is a central tenet of his religion. As is the case with defenses raised under the First Amendment's "free exercise" clause, Meyers must show—as a threshold matter—that his beliefs constitute a "religion." In other words, Meyers can trigger RFRA's protections only if he demonstrates that "The Church of Marijuana" is a bona fide religion for RFRA purposes.

As is true of the First Amendment, RFRA could easily become the first refuge of scoundrels if defendants could justify illegal conduct simply by crying "religion." To assert a free exercise defense, a defendant first must show that his "religion" is bona fide. *Yoder,* 406 U.S. at 215–16, 92 S.Ct. at 1533–34. On this issue, the Fifth Circuit has aptly observed:

> While it is difficult for the courts to establish precise standards by which the bona fides of a religion may be judged,[*] such difficulties have proved to be no hindrance to denials of First Amendment protection to so-called religions which tend to mock established institutions and are obviously shams and absurdities and whose members are patently devoid of religious sincerity.

*Theriault v. Carlson,* 495 F.2d 390, 395 (5th Cir.1974).[2] Before delving into the bona

---

**2.** *See also, United States v. Kuch,* 288 F.Supp. 439, 443 (D.D.C.1968) (member of "church" that uses LSD and marijuana cannot obtain First

Amendment protections "merely by adopting religious nomenclature and cynically using it as a shield to protect them when participating in anti-

fides of Meyers' marijuana-based "religion," the Court must decide a threshold issue that arises under RFRA and which no other courts have addressed: Whether Congress defined "religion" under RFRA in the same way that federal courts have defined "religion" for First Amendment purposes.

■ Perhaps realizing that defining "religion" would require it to "ponder the imponderable and define the indefinable," *Jacques v. Hilton*, 569 F.Supp. 730, 731 (D.N.J.1983), Congress did not attempt to define "religion" in RFRA's definition section. Although RFRA does not define "religion," its language suggests that courts should rely on First Amendment case law to define that which is left undefined. This suggestion arises from the obvious fact that RFRA is based on, and responds to, First Amendment jurisprudence. *See* 42 U.S.C. § 2000bb(a). Congress expressly stated that the purpose of RFRA is "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 [83 S.Ct. 1790, 10 L.Ed.2d 965] (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 [92 S.Ct. 1526, 32 L.Ed.2d 15] (1972)." 42 U.S.C. § 2000bb(b). The compelling interest test is, of course, a constitutional test. Because RFRA uses pre-*Smith* constitutional standards to establish statutory rights, this Court concludes that RFRA defines "religion" in the same way that federal courts have defined "religion" for First Amendment purposes.

■ Having decided that "religion" under RFRA is the same as "religion" under the First Amendment, the Court turns to the patchwork of cases that, considered together, provide a workable definition of "religion." The Court examines these cases with two prudential propositions in mind. The first is that one man's religion will always be another man's heresy. The Court will not, therefore, find that a particular set of beliefs is not religious because it disagrees with the beliefs. *See Kuch*, 288 F.Supp. at 443 (court must not use own moral and ethical standards to determine whether beliefs are "religious"). Nor will the Court find that a particular set of beliefs is not religious because the beliefs are, from either the Court's or society's perspective, idiosyncratic, strange, solipsistic, fantastic, or peculiar.[3] *See Africa v. Commonwealth*, 662 F.2d 1025, 1030 (3d Cir.1981) (judges are not "oracles of theological verity"); *Stevens v. Berger*, 428 F.Supp. 896, 899 (E.D.N.Y.1977) (apparently preposterous beliefs can be religious and merit constitutional protection). The second proposition is that if there is any doubt about whether a particular set of beliefs constitutes a religion, the Court will err on the side of freedom and find that the beliefs are a religion. In a country whose founders were animated in large part by a desire for religious liberty, to do otherwise would ignore a venerable (albeit checkered) history of freedom and tolerance.

As a number of courts have observed, the Supreme Court's forays into the metaphysical realm "religion" have not resulted in any sort of comprehensive definition of the term. *Africa*, 662 F.2d at 1031; *Kuch*, 288 F.Supp. at 443.[4] The Court's first foray miscarried badly when it held that "[t]he term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they

---

social conduct that otherwise stands condemned").

**3.** The court in *Saint Claire v. Cuyler*, 481 F.Supp. 732, 736 (E.D.Pa.1979), *rev'd on other grounds*, 634 F.2d 109 (3d Cir.1980), was simply wrong when it stated that "[s]o long as no idiosyncratic religious claims are made, particular to the individual asserting the right to the practice, the court is bound only to assess the sincerity of the believer and not the significance of the belief." Long ago, Judaism, Christianity, and Islam were "idiosyncratic" and particular to a few individuals. The same can be said of newer religions, such as the Church of Mormon and the Unification Church. Under the *Saint Claire* court's approach, none of these religions at their inception

would have been entitled to First Amendment protection.

**4.** The Court's meandering in this area have sparked a significant scholarly debate. Whether this debate will help fill the theoretical and definitional void left by the Court's failure to define "religion" is an open issue. *See* G. Freeman, *The Misguided Search for the Constitutional Definition of Religion*, 71 Geo.L.J. 1519 (1983); J. Choper, *Defining Religion in the First Amendment*, 1982 U.Ill.L.Rev. 579; T. Hall, *The Sacred and the Profane: A First Amendment Definition of Religion*, 61 Tex.L.Rev. 139 (1982); Note, *Toward a Constitutional Definition of Religion*, 91 Harv.L.Rev. 1056 (1978); and articles collected in *Africa*, 662 F.2d at 1032 n. 12.

impose of reverence for his being and character, and of obedience to his will." *Davis v. Beason,* 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637 (1890). Though Cotton Mather probably would have agreed with this monotheistic statement, later incarnations of the Court did not. In *Torcaso v. Watkins,* 367 U.S. 488, 495 n. 11, 81 S.Ct. 1680, 1684 n. 11, 6 L.Ed.2d 982 (1961), the Supreme Court moved away from a theistically narrow definition of religion when it observed that the First Amendment does not allow states to enact laws which discriminate between theistic and non-theistic religions. The Court moved even further away from the traditional theistic view of religion in the conscientious objector cases. *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970). In these cases, both of which addressed the meaning of the phrase "religious training and belief" as used in the draft act, the Court dispensed with the theistic/non-theistic approach and adopted a "parallel belief" approach:

> The test [for a "religious training and belief" exemption] might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption. . . .

*Seeger,* 380 U.S. at 176, 85 S.Ct. at 859; *Welsh,* 398 U.S. at 344, 90 S.Ct. at 1798 (conscientious objector section exempts those opposed to war because of "deeply held moral, ethical, or religious beliefs").[5] If there was any hope that the parallel belief test—which is a functional test that "define[s] 'religion' in terms of the role a belief plays in the individual's or group's life"[6]—might be carried over to the Religion Clauses, the Court dashed the hope in *Yoder:*

> [I]f the Amish asserted their [free exercise] claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majori-

ty, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis.

406 U.S. at 216, 92 S.Ct. at 1533. Those familiar with Thoreau's transcendental philosophy know that if anyone held "sincere and meaningful beliefs" occupying a place in his life "parallel to that filled by the God" of others, it was Thoreau. It seems, therefore, that the functional definition of "religion" adumbrated in *Seeger* and *Welsh* is, at least for First Amendment purposes, dead.

■ Although the Supreme Court has done little to identify positively what "religion" is for First Amendment purposes, it has done a slightly better job of providing guidelines that courts should follow when attempting to determine whether a set of beliefs is "religious." First, courts may not consider whether the party's purportedly religious beliefs are true or false. *United States v. Ballard,* 322 U.S. 78, 92, 64 S.Ct. 882, 889, 88 L.Ed. 1148 (1944). Speaking strongly in defense of religious freedom, the *Ballard* Court stated: "Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs." *Id.* at 86, 64 S.Ct. at 886. Second, courts cannot rely on their perhaps biased and traditional ideas about what constitutes a religion. As the Supreme Court put it in *Thomas v. Review Board,* 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981), "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."

Taking heed of these proclamations, nearly every lower court to tackle the "religion" issue begins its analysis with cautionary statements. *See Africa,* 662 F.2d at 1031 (judges are ill-equipped to examine breadth and content of avowed religion and must avoid predisposition toward conventional religions); *Remmers v. Brewer,* 361 F.Supp. 537,

---

**5.** *Contra Berman v. United States,* 156 F.2d 377, 380 (9th Cir.1946), *cert. denied,* 329 U.S. 795, 67 S.Ct. 480, 91 L.Ed. 680 (1946) ("religion" as used in draft act does not include conscientious social belief).

**6.** L. Tribe, *American Constitutional Law* 1182 (2d ed. 1988).

540 (S.D.Iowa 1973) (court must give "religion" wide latitude to ensure that state approval never becomes prerequisite to practice of faith); *Wiggins v. Sargent,* 753 F.2d 663, 666 (8th Cir.1985) (court must cautiously approach "extremely delicate task" of determining whether belief is religious); *Stevens,* 428 F.Supp. at 899 (court faces severe limitations when undertaking this "difficult and sensitive factfinding task"). Though the sensitivity of this task has caused courts to tread lightly on the waters of religion, they have not feared to tread there: "when an individual invokes the first amendment to shield himself or herself from otherwise legitimate state regulation, we are required to make such uneasy differentiations." *Africa,* 662 F.2d at 1031. As Judge Skelly–Wright put it:

> Not every enterprise cloaking itself in the name of religion can claim the constitutional protection conferred by that status.... When otherwise proscribed substances are permitted to be used for purposes of worship, worship must be defined.

*Founding Church of Scientology v. United States,* 409 F.2d 1146 (D.C.Cir.1969); *Stevens,* 428 F.Supp. at 900 (requirements of ordered society mandate inquiry into bona fides of religion).

In their often admirable efforts to define "religion," the lower courts have raised issues, proferred ideas, quoted rules, and formulated principles. No one court, however, has articulated what appears to be the penultimate test for "religion." Indeed, some courts have observed that there can be no such test. Judge Augustus Hand was of the opinion that "the content of the term ["religion"] is found in the history of the human race and is incapable of compression into a few words." *United States v. Kauten,* 133 F.2d 703, 708 (2d Cir.1943). Another court has opined that a "succinct and comprehensive" definition of religion "would appear to be a judicial impossibility." *Remmers,* 361 F.Supp. at 540; *accord Sherr,* 672 F.Supp. at 92 (defining religion may be "virtually impossible").

It may be that given the ethereal and evolving nature of religion, there never should be such a test. Fixing a definition carries risks. If—in the laudable interest of protecting every conceivable form of religion, present and future—the definition is exceptionally broad, the term "religion" might well be stretched beyond recognition. The danger here lies in the fact that the definition would encompass all manner of outlooks, philosophies, beliefs, and lifestyles. Adherents to these outlooks, philosophies, beliefs, and lifestyles would then be able to claim First Amendment or RFRA protection for their "religious" acts, whether legal or not. On the other hand, not fixing a definition carries risks as well. If—in the laudable interest of retaining the jurisprudential flexibility to include new religions and to exclude social philosophies—the definition is left vague, the "term" religion might acquire different meanings depending on the predilections of a particular court. The danger here lies in the fact that a court with particular leanings might manipulate the definition to include beliefs with which it agrees, while a court with different leanings later might manipulate the definition to exclude beliefs with which it disagrees. In other words, the trees of religious freedom would bend with the political breeze.

In an attempt to avoid these dangers, this Court has canvassed the cases on religion and catalogued the many factors that the courts have used to determine whether a set of beliefs is "religious" for First Amendment purposes. These factors, as listed below, impose some structure on the word "religion." The structure necessarily is calico, composed—as it is—of language, history, theology, philosophy, psychology, and law. It is, nonetheless, structure. The Court will use this structure to include, not exclude. By this, the Court means that it will examine Meyers' beliefs to determine if they fit the factors. To the extent they do, it indicates to the Court that his beliefs are religious. The threshold for inclusion—i.e., that Meyers' beliefs are religious—is low. This minimal threshold, uncertain though it may be, ensures that the Court errs where it should, on the side of religious freedom. The Court will not, on the other hand, examine Meyers' beliefs and conclude that they are not religious because they do not fit the factors.

Bluntly stated, there is no absolute causal link between the fact that Meyers' beliefs do not fit the criteria and the conclusion that his beliefs are not religious.

■ With this in mind, the Court will consider the following factors to determine whether Meyers' beliefs are "religious" for RFRA purposes:

1. *Ultimate Ideas:* Religious beliefs often address fundamental questions about life, purpose, and death. As one court has put it, "a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters." *Africa,* 662 F.2d at 1032. These matters may include existential matters, such as man's perception of life; ontological matters, such as man's sense of being; teleological matters, such as man's purpose in life; and cosmological matters, such as man's place in the universe.

2. *Metaphysical Beliefs:* Religious beliefs often are "metaphysical," that is, they address a reality which transcends the physical and immediately apparent world. Adherents to many religions believe that there is another dimension, place, mode, or temporality, and they often believe that these places are inhabited by spirits, souls, forces, deities, and other sorts of inchoate or intangible entities.

3. *Moral or Ethical System:* Religious beliefs often prescribe a particular manner of acting, or way of life, that is "moral" or "ethical." In other words, these beliefs often describe certain acts in normative terms, such as "right and wrong," "good and evil," or "just and unjust." The beliefs then proscribe those acts that are "wrong," "evil," or "unjust." A moral or ethical belief structure also may create duties—duties often imposed by some higher power, force, or spirit—that require the believer to abnegate elemental self-interest.[7]

4. *Comprehensiveness of Beliefs:* Another hallmark of "religious" ideas is that they are comprehensive. More often than not, such beliefs provide a *telos,* an overarching array of beliefs that coalesce to provide the believer with answers to many, if not most, of the problems and concerns that confront humans. In other words, religious beliefs generally are not confined to one question or a single teaching. *Africa,* 662 F.2d at 1035.

5. *Accoutrements of Religion:* By analogy to many of the established or recognized religions, the presence of the following external signs may indicate that a particular set of beliefs is "religious"[8]:

a. *Founder, Prophet, or Teacher:* Many religions have been wholly founded or significantly influenced by a deity, teacher, seer, or prophet who is considered to be divine, enlightened, gifted, or blessed.

b. *Important Writings:* Most religions embrace seminal, elemental, fundamental, or sacred writings. These writings often include creeds, tenets, precepts, parables, commandments, prayers, scriptures, catechisms, chants, rites, or mantras.

c. *Gathering Places:* Many religions designate particular structures or places as sacred, holy, or significant. These sites often serve as gathering places for believers. They include physical structures, such as churches, mosques, temples, pyramids, synagogues, or shrines; and natural places, such as springs, rivers, forests, plains, or mountains.

d. *Keepers of Knowledge:* Most religions have clergy, ministers, priests, reverends, monks, shamans, teachers, or

7. To the extent that these morals or ethics restrain behavior, they comport with the original meaning of the word "religion," which comes from the Latin verb *religare,* meaning to "tie back" or "rebind." *Fellowship of Humanity v. County of Alameda,* 153 Cal.App.2d 673, 315 P.2d 394, 401 (1957); Van Alstyne, *First Amendment* at 1101 n. 1.

8. Professor Tribe argues that courts cannot properly rely on these types of "externalities" because they "unduly constrain the concept of religion." *American Constitutional Law* at 1181–82. Using the "inclusion" approach, precisely the opposite is true: the Court may find that a new, unique, or unfamiliar set of beliefs is "religious" because the beliefs exhibit some of the vast array of "externalities" that are the hallmarks of most other religions.

sages. By virtue of their enlightenment, experience, education, or training, these people are keepers and purveyors of religious knowledge.

e. *Ceremonies and Rituals:* Most religions include some form of ceremony, ritual, liturgy, sacrament, or protocol. These acts, statements, and movements are prescribed by the religion and are imbued with transcendent significance.

f. *Structure or Organization:* Many religions have a congregation or group of believers who are led, supervised, or counseled by a hierarchy of teachers, clergy, sages, priests, etc.

g. *Holidays:* As is etymologically evident, many religions celebrate, observe, or mark "holy," sacred, or important days, weeks, or months.

h. *Diet or Fasting:* Religions often prescribe or prohibit the eating of certain foods and the drinking of certain liquids on particular days or during particular times.

i. *Appearance and Clothing:* Some religions prescribe the manner in which believers should maintain their physical appearance, and other religions prescribe the type of clothing that believers should wear.

j. *Propagation:* Most religious groups, thinking that they have something worthwhile or essential to offer non-believers, attempt to propagate their views and persuade others of their correctness.

This is sometimes called "mission work," "witnessing," "converting," or proselytizing.[9]

As is apparent, the Court has compiled many of these factors by looking to other religions as models.[10] *E.g., Malnak v. Yogi,* 592 F.2d 197, 207 (3d Cir.1979). Despite this fact, the Court recognizes that it cannot rely solely on established or recognized religions to guide it in determining whether a new and unique set of beliefs warrants inclusion. Thus, the Court again emphasizes that no one of these factors is dispositive, and that the factors should be seen as criteria that, if minimally satisfied, counsel the inclusion of beliefs within the term "religion."[11] *See Malnak,* 592 F.2d at 210 (three indicia of religion are "helpful" but not a final test for religion).

Under this low-threshold "inclusion test," the Court presumes that the following sets of beliefs are "religious": Judaism, Christianity, Islam, Hinduism, Buddhism, Shintoism, Confucianism, and Taoism. Undoubtedly, the test also would lead to the conclusion that the beliefs of the following groups are "religious": Hare Krishnas, Bantus, Mormons, Seventh Day Adventists, Christian Scientists, Scientologists, Branch Davidians, Unification Church Members, and Native American Church Members (whether Shamanists or Ghost Dancers). More likely than not, the test also includes obscure beliefs such as Paganism, Zoroastrianism, Pantheism, Animism, Wicca, Druidism, Satanism, and Sante-

9. The Court has gleaned many of these factors from the following cases: *Africa,* 662 F.2d at 1025; *Malnak,* 592 F.2d at 197; *United States v. Sun Myung Moon,* 718 F.2d 1210 (2d Cir.1983); *Founding Church of Scientology,* 409 F.2d at 1146; *Washington Ethical Soc'y v. District of Columbia,* 249 F.2d 127 (D.C.Cir.1957); *Kauten,* 133 F.2d at 703; *Sherr,* 672 F.Supp. at 81; *Jacques,* 569 F.Supp. at 730; *Church of the Chosen People v. United States,* 548 F.Supp. 1247 (D.Minn.1982); *Womens Services, P.C. v. Thone,* 483 F.Supp. 1022 (D.Neb.1979), *aff'd,* 636 F.2d 206 (8th Cir.1980); *Stevens,* 428 F.Supp. at 896; *Remmers,* 361 F.Supp. at 537; *Kuch,* 288 F.Supp. at 439; *Fellowship of Humanity,* 315 P.2d at 394.

10. Unfortunately, another factor that the Court could have included in the list is "Dogmatism and Intolerance." One need not be exceptionally familiar with the course of human history to realize that religious intolerance has been and continues to be the cause of countless deaths, many wars, and endless suffering.

11. This Court is aware of the Second and Third Circuit split on the issue of whether "religion" can have a different meaning depending on which religion clause of the First Amendment is at issue. *Compare Malnak,* 592 F.2d at 210, *with United States v. Allen,* 760 F.2d 447, 450 (2d Cir.1985). Because this case concerns the free exercise clause and not the establishment clause, the Court need not decide the issue. The Court notes, however, that while the Second Circuit (and Professor Tribe) make appealing policy arguments in favor of a dual definition, the Third Circuit correctly observes that the First Amendment does not contain any textual support for a dual definition. *See Everson v. Board of Education,* 330 U.S. 1, 32, 67 S.Ct. 504, 519, 91 L.Ed. 711 (1946) (Rutledge, J., dissenting).

ria. And, casting a backward glance over history, the test assuredly would have included what we now call "mythology": Greek religion, Norse religion, and Roman religion.

All of this probable inclusion leads to an obvious question: Is anything excluded? Purely personal, political, ideological, or secular beliefs probably would not satisfy enough criteria for inclusion. *See Africa,* 662 F.2d at 1036 (holding that beliefs are secular, not religious); *Berman,* 156 F.2d at 380–81 (holding that beliefs are moral and social, not religious); *Jacques,* 569 F.Supp. at 736 (holding that beliefs are personal, not religious); *Church of the Chosen People,* 548 F.Supp. at 1253 (holding that beliefs are sexual and secular, not religious). Examples of such beliefs are: nihilism, anarchism, pacifism, utopianism, socialism, libertarianism, Marxism, vegetism, and humanism. However, rather than answering the exclusion question solely in the abstract, the Court will answer it concretely by examining Meyers' beliefs concerning the "Church of Marijuana."

## III. THE NATURE OF MEYERS' BELIEFS

During a hearing conducted outside the presence of the jury, Meyers attempted to prove the bona fides of his alleged religion. Meyers testified that he has smoked marijuana since the age of 16, and that he smoked marijuana because it cured him of manic depression. When he has access to marijuana, Meyers smokes between 10 and 12 joints per day. Although Meyers lived in Ethiopia for a while, he apparently did not join the Ethiopian Zion Coptic Church, which is a Christian sect that uses marijuana as a sacrament. *See Olsen v. DEA,* 878 F.2d 1458 (D.C.Cir.1989). Meyers stated that he began worshipping marijuana because it brought peace into his life.

Meyers founded the "Church of Marijuana" in 1973. The church allegedly has 800 members and one designated meeting spot. The church's "religion" is to grow, possess, and distribute marijuana. The church's "bible" is a ponderously titled book: *Hemp & the Marijuana Conspiracy: The Emperor Wears No Clothes—The Authoritative Historical Record of the Cannabis Plant, Marijuana Prohibition, & How Hemp Can Still Save the World ("Hemp ").* The church does not have a formal clergy, but does have approximately 20 "teachers." Meyers did not explain what the teachers do. Although there are teachers, the church has no hierarchy or governing body. The church does not attempt to propagate its beliefs in any way, and does not assert that everyone should smoke marijuana. Nonetheless, part of the "religion" is to work towards the legalization of marijuana.

Meyers testified that he (and presumably other church members) pray to the marijuana plant. The church's only ceremony revolves around one act: the smoking and passing of joints. Joint smoking apparently results in a sort of "peaceful awareness." Meyers did not assert that this "peaceful awareness" is a religious state. While "peacefully aware" (vulgarly known as being "high"), church members "talk to one another." Meyers did not divulge the nature of their discussions. There are no formal church services.

As Meyers sees things, marijuana has great social value. With impressive alliteration, he called marijuana "the persecuted plant of peace." Meyers commented that marijuana plays a role in social bonding, and—most importantly—it keeps people off more harmful drugs such as heroin, methamphetamine, cocaine, and alcohol. The "Church of Marijuana" uses the sacred weed to wean addicts from these more harmful drugs.

In response to a question from the Court concerning the church's moral code, Meyers said that it was "to give a hand up, but not a hand out." Apparently, this is a reference to the church's efforts to help addicts kick their alcohol and hard drug habits. In this respect and others, marijuana is a "miracle medicine." Meyers referred to marijuana as a medicine many times during the hearing.

In response to questioning from the Court about the church's teachings, if any, on "ultimate ideas" such as life, death, and purpose, Meyers essentially stated that his views on these issues are Christian. In fact, he observed, he is a Christian. Although (an ap-

parently Christian) God is at the top of the religion, "the marijuana plant is the center of attention." Meyers said that all church members are Christians, but did not assert that the church was a Christian sect or denomination.

## IV. MEYERS' BELIEFS ARE NOT "RELIGIOUS" UNDER RFRA

### A. Ultimate Ideas

During his discursive testimony about his ostensible religion, Meyers never mentioned any beliefs that dealt with "ultimate concerns" such as life, purpose, and death. The "Church of Marijuana" apparently has nothing to say about profound and sublime issues such as man's sense of self, purpose in life, role in the world, existence in time, and being in space. Meyers neither mentioned nor discussed any beliefs that respond to the sorts of concerns that most other religions address: a fear of the unknown, the pain of loss, a sense of alienation, feelings of purposelessness, the inexplicability of the world, and the prospects of eternity. The Court simply was unable to discern anything ultimate, profound, or imponderable about Meyers' beliefs.

### B. Metaphysical Beliefs

There is nothing metaphysical about Meyers' beliefs. Indeed, everything about his beliefs is physical. He smokes the dried leaves of a plant, and the resulting psychopharmacological effects leave him in a state of "peaceful awareness." Though the Court does not doubt that certain physical states of being can engender or induce different mental states of being, this does not mean that deliberately altered physical states of being are themselves "religious." The Court also recognizes that certain religions use mind-altering substances, or engage in mind-altering physical activities (such as fasting or sitting in sweat lodges), as a means to a spiritual end. The end usually is movement toward, or the perception of, a different reality or dimension. Here, there is no such end.

Meyers did not say that smoking 10 to 12 joints a day propelled him into a perpetual state of religious awareness, or that smoking 10 to 12 joints a day was a means to a religious end. For Meyers, the end appears to be smoking marijuana. Meyers never equated marijuana smoking with a spiritual dimension, mystical plane, or transcendent reality. Although Meyers thinks that smoking marijuana has great therapeutic value, he did not assert that smoking marijuana lofts him into the realm of the religious. Thus, there does not appear to be anything metaphysical about Meyers' beliefs.

### C. Moral or Ethical System

The Church of Marijuana apparently has only one ethical or moral precept: "Give a hand up, not a hand out." Meyers mentioned this motto only after the Court asked him whether his religion had any moral or ethical beliefs. Meyers went on to explain that his church gives others "a hand" by helping drug addicts and alcoholics kick their habits. The church does so by using marijuana as a substitute for other drugs or alcohol.

Although helping others kick detrimental habits certainly is a laudable goal, it hardly supplies church members with the pervasive guidance that ethics or morals provide. A single precept that encourages church members to help drug addicts or alcoholics kick their habits does not answer questions such as: How should I live my life? How should I treat others? What is forbidden? What is allowed? A single injunction to help others may itself be moral or ethical under the standard of most religions (or under the standard of secular ethics and morals), but that does not transform the injunction into an ethics or morality.

This aside, Meyers did not discuss any beliefs or commands that require believers to abandon base or elemental self-interest. Nothing about Meyers' "religion" restrains members from doing that which they should not do, or binds them to do that which they should do. It is apparent, therefore, that Meyers' alleged religion has neither produced nor adopted an ethical code or moral system.

## D.  Comprehensiveness of Beliefs

There is nothing comprehensive about Meyers' beliefs.  He worships a single plant; as he put it, the marijuana plant is "the center of attention."  Though marijuana is at the center, Meyers did not explain what consequences ensue.  Meyers did not intimate that things stay together because this center holds.  It does not seem to the Court that the growth, use, possession, and distribution of marijuana is any sort of *telos* or all encompassing goal that informs the lives of church members.  Indeed, as the Court sees it, it would be difficult to conceive of a more monofaceted "religion."  Meyers' purported religion is confined to the alleged beneficence of one plant.  Meyers did not assert that the plant has spoken to him, that it counsels him, that it guides him, or that it teaches him.  In his "religion," the plant essentially is passive.

Though the Court is wary of comparing Meyers' beliefs to those of established religions, it may be appropriate to do so here.  In other religions, such as Native American religions, ancient Mexican religions, and primitive tribal religions, mind-altering plants are sacred.  The plants are not, however, the focus of these religions.  Rather, they are a means to an end, the end being to attain a state of religious, spiritual, or revelatory awareness.  When believers achieve this state, they are privy to all manner of visions and revelations concerning the past, present, and future.  After experiencing these states—which are intense and transitory—they rely on their visions and revelations to guide their actions.

Based on his testimony, it is clear that Meyers' experience with marijuana is much different.  The focus of his religion is to experience continuously the state of mind that results from smoking marijuana.  Though this apparently results in a "peaceful awareness" for Meyers, he does not associate this state of mind with any sort of religious epiphany, spiritual revelation, or transcendental awareness.  Moreover, this awareness apparently does not lead to enlightened percipience concerning the past, present, or future.

As the court in *Malnak* saliently commented, "[a] religion is not generally confined to one question or one moral teaching; it has a broader scope."  592 F.2d at 209.  Here, Meyers' purported religion is confined to one plant.  Though the plant apparently has cured Meyers' manic depression and keeps him calm, this therapeutic effect is not religious.  The marijuana plant does not provide Meyers with the comprehensive inspiration or guidance that the godheads of other religions provide to their followers.

## E.  Accoutrements of Religion

The Church of Marijuana possesses few of the "externalities" that help to identify a set of beliefs as "religious."

**1.  Founder, Prophet, or Teacher:**  Although Meyers founded the church in 1973, he does not claim that he alone possessed the kind of spiritual wisdom, ethereal knowledge, or divine insight that often leads to the founding of a religion.  Meyers calls himself a "Reverend" of the church, but does not assert that he alone is fit for that role, and does not contend that he is divine, enlightened, or gifted.  The Church of Marijuana apparently has no founder or teacher similar to an Abraham, Jesus, Mohammed, Buddha, Confucius, Krishna, Smith, or Black Elk.

**2.  Important Writings:**  Meyers testified that the church's "bible" is *Hemp,* which was written by Jack Herer.  The editors of *Hemp* are Chris Conrad, Lynn Osborne, Judy Osborne, Ellen Komp, and Jeremy Stout.  Meyers did not claim that either Herer or any of the editors are members of the Church of Marijuana, or that they are even aware of its existence.

In the introduction to *Hemp,* Herer—who is the "Director and Founder" of "Help End Marijuana Prohibition (HEMP)"—discusses *Hemp*'s secular purpose: "The purpose of this book is to revive the authoritative historical, social and economic perspective needed to ensure comprehensive legal reforms, abolish cannabis hemp/marijuana prohibition laws, and save the Earth's life systems."  Although the last purpose—saving the earth's life systems—apparently has religious potential, Herer later makes it clear that "saving the earth's life systems" is an environmental issue.

Except for 4 pages of the book that discuss the historical and contemporary use of marijuana by various religions and sects, the remaining 200 and some odd pages cover the following secular topics: the history of hemp, the uses of hemp, the cash value of hemp, the legalization of hemp, the prohibition of hemp, medicinal uses of hemp, therapeutic uses of hemp, the food value of hemp, the sociology of hemp, the environment and hemp, and energy and hemp. *Hemp* contains little original writing; it is filled primarily with reprints from newspapers, magazines, books, newsletters, studies, and cartoons. These reprints, of course, are about marijuana. The last 30 pages of *Hemp* contain helpful advertisements and order forms for those who want to participate in marijuana reform efforts, for those who want t-shirts sporting marijuana designs and slogans, and for those who want to buy marijuana-based products such as hemp oil, hemp clothes, hemp jewelry, hemp ropes, hemp paper, and hemp food. There are also advertisements for marijuana movies, marijuana cookbooks, marijuana groups, and marijuana museums.

*Hemp* does not purport to be a sacred or seminal book containing tenets, precepts, rites, creeds, or parables. While it is an interesting book full of information, statistics, studies, data, reprints, history, arguments, and advertising, it does not touch upon the lofty or fundamental issues associated with religious works. *Hemp* bears absolutely no resemblance to recognized religious texts such as the Talmud, Bible, Gnostic Gospels, Koran, Veda, Bhagavad–Gita, or Book of Mormon. *Hemp*'s profane concerns are so topical, political, and commercial, that it could not even be called a work of philosophy. More importantly, Meyers did not claim that the Church of Marijuana uses or relies on *Hemp* in any way, and he did not claim that the book provides him with any sort of inspiration or guidance. He simply asserted, unconvincingly, that *Hemp* was his "bible."

**3. Gathering Places:** Although the Church of Marijuana apparently has a building of some sort at which members gather to smoke marijuana, Meyers did not assert that the building was in any way holy, sacred, or significant. The building in which church members gather apparently has no larger significance to them, as might a synagogue, mosque, temple, or shrine.

**4. Keepers of Knowledge:** Meyers asserts that he is a "Reverend" of the "Church of Marijuana." How he attained this revered position remains a mystery. Meyers did not mention any special training, experience, or education that qualified him for this position. Apparently, he is the only "clergy" member of the church. Because Meyers did not testify about any special duties he had, teachings he provided, or guidance he gave, the Court can only guess that (based on his descriptions of church "services") it is his sacerdotal duty to obtain marijuana, grow it, prepare it, smoke it, and share it.

**5. Ceremonies or Rituals:** The Church of Marijuana has only one ceremony or ritual: to smoke and pass joints. The church has no services, no prayers, no liturgy, no sacrament, and no blessings (such as baptism or marriage).

**6. Structure or Organization:** The Church of Marijuana has approximately 800 members, 20 of whom are "teachers." Meyers did not explain what teachers did. To give Meyers the benefit of the doubt, the Court will assume (because Meyers did not state) that as "Reverend," Meyers is the foremost church member, and that the teachers are immediately below him either in terms of learning, prestige, knowledge, seniority, or authority.

**7. Holidays:** Meyers did not mention any church holidays, special days, or holy days.

**8. Diet or Fasting:** Meyers did not testify about any special diet or days of fasting that church members are required or asked to observe.

**9. Appearance and Clothing:** Meyers did not mention any beliefs concerning a church member's appearance or clothing.

**10. Propagation:** Meyers testified that the Church of Marijuana does not engage in any type of mission work or witnessing in an effort to convert non-believers or non-smokers.

Although Meyers' beliefs satisfy few of the criteria that are the hallmarks of other religions, the Court does not on this basis alone conclude that his beliefs are not statutorily "religious." The Court also considers the fact that Meyers' beliefs are more aptly characterized as medical, therapeutic, and social. Over and again, Meyers observed that marijuana was a medicine that had cured him of manic depression and that had cured others of their illnesses. He asserted that marijuana is a medicine that can be used to cure others of their addictions. Meyers also testified (in so many words) that marijuana had great therapeutic value for him and others. Marijuana smoking calms Meyers and brings him peace; apparently, it has done so for others as well. Finally, Meyers testified, this time explicitly, that marijuana smoking resulted in "social" bonding and brought him closer to others.

Marijuana's medical, therapeutic, and social effects are secular, not religious. The Court recognizes that secular and religious beliefs can overlap. Indeed, to the extent that religious beliefs are sincere, they probably will spill over into the secular. This overlap led the court in *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir.1981), to comment that "a coincidence of religious and secular [beliefs] in no way extinguishes the weight appropriately accorded the religious [beliefs]." *Accord Wiggins*, 753 F.2d at 666. Here, the Court cannot give Meyers' "religious" beliefs much weight because those beliefs appear to be derived entirely from his secular beliefs. In other words, Meyers' secular and religious beliefs overlap only in the sense that Meyers holds secular beliefs which he believes in so deeply that he has transformed them into a "religion."

While Meyers may sincerely believe that his beliefs are religious, this Court cannot rely on his sincerity to conclude that his beliefs rise to the level of a "religion" and therefore trigger RFRA's protections. Meyers is, of course, absolutely free to think or believe what he wants. If he thinks that his beliefs are a religion, then so be it. No one can restrict his beliefs, and no one should begrudge him those beliefs. None of this, however, changes the fact that his beliefs do not constitute a "religion" as that term is uneasily defined by law. Were the Court to recognize Meyers' beliefs as religious, it might soon find itself on a slippery slope where anyone who was cured of an ailment by a "medicine" that had pleasant side-effects could claim that they had founded a constitutionally or statutorily protected religion based on the beneficial "medicine." The Court declines Meyers' invitation to step onto that slope.

The Court must, however, step onto a slope of a different sort to assess Meyers' belated assertion that he and the other members of the Church of Marijuana are Christians. At first blush, this complicates things considerably. Had Meyers asserted that the Church of Marijuana was a Christian sect, and that his beliefs were related to Christianity, this Court probably would have been compelled to conclude that his beliefs were religious. Under these hypothetical circumstances, Meyers would have been able to fit his beliefs into a tradition that is indisputably religious. If Meyers had linked his beliefs to Christianity, the Court could not have inquired into the orthodoxy or propriety of his beliefs, no matter how foreign they might be to the Christian tradition. *Ballard*, 322 U.S. at 87, 64 S.Ct. at 886 (courts cannot assess validity of beliefs); *Teterud v. Burns*, 522 F.2d 357, 360 (8th Cir.1975) (courts cannot determine religious orthodoxy). Had Meyers sincerely made such a connection, he would have been able to purchase "religious" status for his beliefs by coattailing on Christianity. Unfortunately for Meyers, he made no such connection.

Instead, Meyers presented the Church of Marijuana as a "stand alone" religion. He did not testify that it was a Christian church or sect. Meyers had nearly finished testifying about his beliefs and "religion" when, under questioning from the Court about his ultimate beliefs, he mentioned that he was a Christian. After asserting that other church members also were Christians and that they believed in God, Meyers never mentioned Christianity again. He did not claim that any of his beliefs were based on Christianity, or that any of his beliefs were related to Christianity. Meyers did not assert, as did

the defendant in *United States v. Sams,* 980 F.2d 740 (9th Cir.1992) (unpublished disposition), that the Christian God condoned and encouraged man to grow and use marijuana, or "herb" as it is referred to in Genesis 1:29 and 1 Corinthians 10:1. Meyers did not cite any Christian texts, refer to any Christian doctrines, or discuss any Christian teachings in support of his beliefs. The Court cannot, therefore, conclude that his marijuana smoking is rooted, let alone "deeply rooted," in Christian religious belief. *Teterud,* 522 F.2d at 360.

### CONCLUSION

In finding that Meyers' beliefs do not rise to the level of a statutorily protected religion, the Court has to a certain extent relied on factors that are the common denominators of every religion discussed in case law and most religions known to the Court. The risk of such an approach is that it might be too restrictive and not sensitive to new and developing forms of religions. The Court is aware of this risk, and the possibility that a new religion may be *sui generis:* so different from all known forms of extinct and existing religions that it fits none of the criteria the Court has listed above. This is a risk, however, inherent to the First Amendment and RFRA. The fact remains that both the amendment and the statute contain the word "religion." If the First Amendment and RFRA are to have any meaning—including some beliefs and excluding others—the courts must shape and form the term "religion." That is what the Court has attempted here, to shape and form.

In doing so, the Court appropriately has been cautious. The Court has given Meyers the benefit of the doubt by not scrutinizing the sincerity of his beliefs. The Court has done so even though it suspects Meyers is astute enough to know that by calling his beliefs "religious," the First Amendment or RFRA might immunize him from prosecution. The Court notes that Meyers' professed beliefs have an ad hoc quality that neatly justify his desire to smoke marijuana. The Court in fact commented on this when it ruled from the bench that Meyers' beliefs do not constitute a "religion" under RFRA.

Nonetheless, the Court does not rest its holding today on a finding that Meyers has concocted a sham religion in order to avoid prosecution. *See, e.g., Kuch,* 288 F.Supp. at 445 ("religion" that encourages use of marijuana and LSD adopted attributes of religion for tactical purpose of obtaining constitutional protection).

The Court's holding today rests primarily on the fact that Meyers' beliefs meet almost none of the criteria that are the hallmarks of religious belief, and on the fact that his beliefs are secular (i.e., medical, therapeutic, and social). The Court emphasizes that its holding is narrow, limited to Meyers' beliefs as he presented them to this Court and as they now apparently exist. Though his undeveloped and nascent beliefs may contain within them the seed of a new religion, the seed has not yet germinated.

The Court therefore finds that Meyers' beliefs do not constitute a religion for RFRA purposes, and **ORDERS** that his motion to raise a RFRA defense is denied. This order incorporates and supersedes the Court's oral bench order on October 2, 1995.