**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 39518**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2013 Opinion No. 18 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: March 21, 2013 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| LEVON FRED CORDINGLEY, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Kathryn A. Sticklen, District Judge; Hon. Thomas P. Watkins, Magistrate.

Decision, on intermediate appeal, affirming magistrate's order denying motion to dismiss possession of marijuana and paraphernalia charges, <u>affirmed</u>.

Ellsworth, Kallas & DeFranco, P.L.L.C.; Joseph L. Ellsworth, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Nicole L. Schafer, Deputy Attorney General, Boise, for respondent.

---

GUTIERREZ, Chief Judge

Levon Fred Cordingley appeals from the district court's intermediate appellate decision affirming the magistrate's denial of his motion to dismiss the possession of marijuana and paraphernalia charges against him on the basis his right to religious freedom under the Idaho Free Exercise of Religion Protected Act (FERPA), Idaho Code §§ 73-401 to 73-404, was violated by enforcement of the controlled substances statutes. For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

In February 2008, Cordingley was arrested after officers found him in possession of marijuana and related paraphernalia. He was cited for possession of marijuana, I.C. § 37-2732, and marijuana paraphernalia, I.C. § 37-2734A. He filed a motion to dismiss the charges, arguing

1

his possession of the drug and associated paraphernalia was an exercise of his religion and, therefore, protected under the FERPA. At a hearing before the magistrate on the motion, Cordingley testified he was the founder of the Church of Cognitive Therapy (COCT), established specifically for the use of marijuana as a "sacrament."

The magistrate issued an order denying the motion to dismiss, determining Cordingley failed to meet his burden to show he was engaged in statutorily recognized religious practice protected by the FERPA. Cordingley entered a conditional guilty plea to the charges, reserving his right to appeal the denial of his motion to dismiss. On intermediate appeal, the district court affirmed the magistrate's ruling, also concluding the COCT did not constitute a "religion" for purposes of the statute.[1] Cordingley now appeals.

## II.

## ANALYSIS

Cordingley contends the district court erred in affirming the magistrate's denial of his motion to dismiss on the basis the controlled substances statutes violate his right to religious freedom under the FERPA. On review of a decision of the district court, rendered in its appellate capacity, we review the decision of the district court directly. *State v. DeWitt*, 145 Idaho 709, 711, 184 P.3d 215, 217 (Ct. App. 2008). We examine the magistrate record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. *Id.* If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure. *Id.*

The operative provision of the FERPA states, in relevant part:

73-402. Free exercise of religion protected.
(1) Free exercise of religion is a fundamental right that applies in this state, even if laws, rules or other government actions are facially neutral.
(2) Except as provided in subsection (3) of this section, government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability.

---

[1] We note a judgment was not entered in this case until after the district court's decision on intermediate appeal. From the record on appeal, it appears the intermediate appeal was not in compliance with Idaho Criminal Rule 54.1 governing appealable judgments and orders in appeals from a magistrate to a district court. However, the appeal from the district court to the Idaho Supreme Court is recognized under Idaho Appellate Rule 11(c)(10).

2

(3) Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is both:
(a) Essential to further a compelling governmental interest;
(b) The least restrictive means of furthering that compelling governmental interest.
. . . .
(5) In this section, the term "substantially burden" is intended solely to ensure that this chapter is not triggered by trivial, technical or de minimus infractions.

Additionally, the Act provides the following definitions in Idaho Code § 73-401:

(1) "Demonstrates" means meets the burdens of going forward with evidence, and persuasion under the standard of clear and convincing evidence.
(2) "Exercise of religion" means the ability to act or refusal to act in a manner substantially motivated by a religious belief, whether or not the exercise is compulsory or central to a larger system of religious belief.
. . . .
(5) "Substantially burden" means to inhibit or curtail religiously motivated practices.

This Court exercises free review over the application and construction of statutes. *State v. Reyes*, 139 Idaho 502, 505, 80 P.3d 1103, 1106 (Ct. App. 2003). Where the language of a statute is plain and unambiguous, this Court must give effect to the statute as written, without engaging in statutory construction. *State v. Burnight*, 132 Idaho 654, 659, 978 P.2d 214, 219 (1999); *State v. Escobar*, 134 Idaho 387, 389, 3 P.3d 65, 67 (Ct. App. 2000). The language of the statute is to be given its plain, obvious, and rational meaning. *Burnight*, 132 Idaho at 659, 978 P.2d at 219. If the language is clear and unambiguous, there is no occasion for the court to resort to legislative history or rules of statutory interpretation. *Escobar*, 134 Idaho at 389, 3 P.3d at 67. When this Court must engage in statutory construction because an ambiguity exists, it has the duty to ascertain the legislative intent and give effect to that intent. *State v. Beard*, 135 Idaho 641, 646, 22 P.3d 116, 121 (Ct. App. 2001). To ascertain such intent, not only must the literal words of the statute be examined, but also the context of those words, the public policy behind the statute, and its legislative history. *Id.*

The legislative history of the FERPA makes it clear that in adopting the statute, the Idaho legislature intended to adopt the "compelling interest test" contained in its federal counterpart, the Religious Freedom Restoration Act (RFRA), which the United States Supreme Court held in

3

*City of Boerne v. Flores*, 521 U.S. 507, 536 (1997) was invalid as it applied to states. *Statement of Legislative Intent*, 2000 Idaho Sess. Laws ch. 133, § 1.[2] Thus, as we recognized in *State v. White*, 152 Idaho 361, 364-65, 271 P.3d 1217, 1220-21 (Ct. App. 2011), the Ninth Circuit's reference to the "compelling interest test" in interpreting the RFRA, is instructive:

> To establish a prima facie RFRA claim, a plaintiff must present evidence sufficient to allow a trier of fact rationally to find the existence of two elements. First, the activities the plaintiff claims are burdened by the government action must be an "exercise of religion." Second, the government action must "substantially burden" the plaintiff's exercise of religion. If the plaintiff cannot prove either element, his RFRA claim fails. Conversely, should the plaintiff establish a substantial burden on his exercise of religion, the burden of persuasion shifts to the government to prove that the challenged government action is in furtherance of a "compelling governmental interest" and is implemented by "the least restrictive means." If the government cannot so prove, the court must find a RFRA violation.

*Id.* (quoting *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (internal citations omitted)).

Therefore, Cordingley must carry the burden of showing that Idaho's controlled substance statutes substantially burden his exercise of "religion" as protected by the statute. Our review of whether he carried this burden, although largely factual in nature, presents mixed questions of fact and law. *White*, 152 Idaho at 365, 271 P.3d at 1221. *See also United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996). The meaning of the FERPA, including the definitions as to what constitutes a substantial burden and the exercise of a "religious" belief, and the ultimate determination as to whether the FERPA has been violated is reviewed de novo. *White*, 152 Idaho at 365, 271 P.3d at 1221. Sincerity is a factual matter and, as with historical and other underlying factual determinations, we defer to the lower court's findings, reversing only if those findings are clearly erroneous. *Id*. In addition, determining whether a person's act is substantially motivated by a "religious" belief requires determinations of fact. *Id*. *See also Toca v. State*, 834 So. 2d 204, 209 (Fla. Dist. Ct. App. 2002) (discussing the issue of whether the

---

[2] Although the Idaho legislature stated it was adopting the compelling interest test of the RFRA, it departed from the RFRA in a key manner by adopting a much broader definition of "substantially burdens." Thus, while the procedural interpretations of the RFRA are helpful, certain substantive interpretations are inapplicable given the difference in Idaho's statutory language.

defendant was, in truth, motivated by religious belief).[3]  Thus, although the issue of whether a belief motivating a particular practice is "religious" is a question of law, the question of what comprises the substantial motivation behind a defendant's conduct--*i.e.*, whether the defendant is motivated by "religious" (as encompassed by the FERPA) or secular purposes--is a question of fact to which we defer to the lower court unless its finding is clearly erroneous.  *White*, 152 Idaho at 365, 271 P.3d at 1221.

In denying Cordingley's motion to dismiss, the magistrate first noted it was undisputed that Cordingley's beliefs were both sincerely held and substantially burdened by the applicable controlled substances statutes.  The magistrate then analyzed whether Cordingley's beliefs are "religious" such that the FERPA is implicated, relying on a multi-factor test utilized by the Tenth Circuit Court of Appeals in *Meyers*, 95 F.3d 1475 to determine whether a particular set of beliefs is "religious" under the RFRA.  The magistrate surmised:

---

[3]    RFRA case law has yielded three main interpretations of the statute's substantial burden prong:  the compulsion test (limiting the applicability of the RFRA to practices that were mandated or compelled by the claimant's religion), the centrality test (requiring a claimant to establish the burdened practice interfered with a central tenet of religious doctrine), and the religious motivation test (only requiring a demonstration that the government prevented the claimant from engaging in conduct both important to them and motivated by sincere religious belief).  *Warner v. City of Boca Raton*, 887 So. 2d 1023, 1033 (Fla. 2004); Steven C. Seeger, Note, *Restoring Rights to Rites:  The Religious Motivation Test and the Religious Freedom Restoration Act*, 95 MICH. L. REV. 1472, 1474-75 (1997).  By specifically defining "exercise of religion" as conduct "'substantially motivated' by a religious belief, whether or not the exercise is compulsory or central to a larger system of religious belief," the Idaho legislature clearly codified the latter of the three interpretations in the FERPA.  I.C. § 73-401(2).

The religious motivation test is generally considered the broadest of the three, as it allows protection for both central and noncentral practices, extends protection to all religious groups, and allows a court to forgo the difficult task of determining the importance of certain religious practices in a claimant's life.  *Warner*, 887 So. 2d at 1033; *Coronel v. Paul*, 316 F. Supp. 2d 868, 878-79 (D. Ariz. 2004).  However, the test does outline key limitations.  First, it requires the claimant to demonstrate that religion principally motivated the activity in question.  *Coronel*, 316 F. Supp. 2d at 879; *Rouser v. White*, 944 F. Supp. 1447, 1455 (E.D. Cal. 1996).  Such an inquiry into a person's state of mind, several courts have noted, is not unusual--the law frequently requires proof of a state of mind and the fact such proof is always circumstantial has not constituted an insurmountable barrier to conviction for specific intent crimes or liability for malicious conduct.  *See Rouser*, 944 F. Supp. at 1455.  Second, courts are not forced to accept the individual's assertion without further inquiry.  *Coronel*, 316 F. Supp. 2d at 879; Seeger, *supra* at 1502 n.153.  On the contrary, the court must determine whether a litigant is sincere in her religious objection to a government policy.  Seeger, *supra* at 1502 n.153.

As Cordingley explained, the COCT is a community within with an emphasis on spirituality, rather than an emphasis on any particular religious beliefs. The goal is to attain enlightenment. This enlightenment can be had by Catholics, Jews, and even atheists. The only connecting fiber among the various members is their use of marijuana to help them in this pursuit. Despite some of the trappings of religion, this is nothing more than a basic philosophical belief that such use will help with enlightenment. This Court believes that more is required to establish religious beliefs that are protected under Idaho law.

On intermediate appeal, the district court affirmed the magistrate's denial of Cordingley's motion to dismiss, first indicating the magistrate did not err in utilizing *Meyers* as guidance into its inquiry of whether Cordingley's use of marijuana was "religious" in nature. The district court then affirmed the magistrate's finding that Cordingley had not carried his burden to show he was engaging in a "religious" practice:

> Cordingley acknowledged that the Church of Cognitive Therapy is not so much a religion as it is a companion to religion. In reality, this church presents an ideology or philosophical belief as to how people can become spiritual or enlightened, but it does not have a comprehensive belief system with the trappings of a religion. There is no evidence that the church provides a belief system with answers to the problems and concerns that confront human beings or that it provides answers to questions about life, purpose, or death. The church does not promote a moral code or rely on any one set of teachings. Instead, the church provides a sacrament that is to be used as an accompaniment to other religious beliefs.

Cordingley's initial argument on appeal is that the magistrate erred in utilizing the test adopted by the Tenth Circuit Court of Appeals in *Meyers* to determine whether his use of marijuana was "religious." Specifically, Cordingley contends the court's reliance on *Meyers* was erroneous since *Meyers* construes the RFRA, which was determined to be unconstitutional in *Flores*. Rather, he asserts, the inquiry should focus on the plain language of the FERPA, which "does not involve a micro-inspection of an individual's belief system to determine whether a belief is sincerely held or is an actual religious conviction" as is dictated by *Meyers*.

Cordingley's argument is unavailing. The fact the RFRA was held to be unconstitutional as applied to the states is irrelevant; it continues to be applicable as to federal law, and we specifically noted in *White* that the caselaw interpreting the RFRA is *instructive* in interpreting the FERPA given that the Idaho legislature explicitly indicated it intended to adopt the RFRA's compelling interest test. *White*, 152 Idaho at 364-65, 271 P.3d at 1220-21. Although *Meyers* is

6

certainly not controlling precedent, as we discuss below, it provides a helpful framework for the key inquiry of whether a particular practice is motivated by statutorily recognized "religion." Relatedly, Cordingley's assertion that the FERPA does not allow for a "micro-inspection" of whether a belief is an "actual religious conviction," is in direct contravention to *White* (as well as the overwhelming majority of both federal and state jurisprudence in this area) where we pointed out that "just because [an individual] has claimed that his impetus for smoking marijuana is religious, does not make it so for the purposes of the FERPA." *White*, 152 Idaho at 369, 271 at 1225. As we explicitly stated, "To establish a free exercise defense, a defendant must *first show that his religion is bona fide* and, by extension, that his conduct is actually motived by *statutorily-recognized* religious beliefs." *Id.* (emphasis added) (citation omitted).

Accordingly, we turn to the salient inquiry in this case--whether Cordingley's use of marijuana was substantially motivated by "religion" such that it is protected pursuant to the FERPA.[4] Although the FERPA defines the "exercise of religion" as "the ability to act or refusal to act in a manner substantially motivated by a religious belief," I.C. § 73-401(2), the statute does not define "religion" or "religious belief," and this issue has not been addressed by Idaho appellate courts. Nor does the RFRA include such a definition. In addition, "religion" is one of the few key terms, if not the only key term, of the First Amendment that the contemporary United States Supreme Court has not authoritatively and comprehensively defined, which has left lower courts to create various approaches to defining the term. Such an undertaking is not easy--as the United States Supreme Court has long recognized, determining whether a belief or practice is "religious" is a "difficult and delicate task." *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 714 (1981). *Accord Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) ("[A] determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question . . . ."); *Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir.

---

[4] On appeal, Cordingley's counsel consistently characterizes Cordingley's religion as Rastafarianism, thus, providing a basis to argue Cordingley ascribes to a previously legally recognized "religious" group. This characterization is belied by the record. Although Cordingley indicated he was ordained in 1997 by a "Rastafarian Youth Group" and made occasional references to Rastafarian beliefs in his testimony, including that the COCT celebrates a Rastafarian holiday, Cordingley testified he is a Christian, whose current practices are based on his membership in the COCT. He made no statements, or implicit references, that he continued to be a practicing Rastafarian.

7

1981) ("[W]hen an individual invokes the first amendment to shield himself or herself from otherwise legitimate state regulation, we are required to make such uneasy differentiations.").

When undertaking this difficult determination, however, there are some applicable overarching principles. In *United States v. Ballard*, 322 U.S. 78, 86-88 (1944), the United States Supreme Court declared that courts may not consider whether the party's purportedly religious beliefs are true or false. The *Ballard* Court added, "The First Amendment does not select any one group or any one type of religion for preferred treatment. It puts them all in that position." *Id*. at 87. Furthermore, in *Thomas*, 450 U.S. at 714, the United States Supreme Court held that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." If there is any doubt about whether a particular set of beliefs constitutes a religion, the court will err on the side of freedom and find the beliefs are a religion. *United States v. Meyers*, 906 F. Supp. 1494, 1499 (D. Wyo. 1995).

On the other hand, in *Yoder*, the United States Supreme Court explained:

> Although a determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself . . . , their claims would not rest on a religious basis. Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses.

*Yoder*, 406 U.S. at 215-16 (footnote omitted).[5]

Without definitive guidance from the Supreme Court, various circuit courts of appeals, as well as state courts, have attempted to apply these principles by creating a variety of tests that generally, but not completely, overlap. Most widely utilized is the multi-factor test, a version of which was articulated by the Tenth Circuit Court of Appeals in *Meyers*, 95 F.3d 1475 and utilized by the magistrate and district court in this case. The genesis of this approach was a

---

[5] In *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Supreme Court examined and "balanced" the interests of the state and the defendants in determining whether the "exercise of religion" by Amish who believed children should not attend school past a certain age, prevented a criminal conviction for violating the State's compulsory school attendance law.

concurring opinion in *Malnak v. Yogi*, 592 F.2d 197 (3d Cir. 1979), and a form of its analysis has since been adopted by at least five of the federal circuit courts of appeals and numerous district and state courts. Under this test, to help determine whether a particular set of beliefs qualifies as "religious" under the RFRA or its state equivalent, a court examines the extent to which a party's asserted "religion" (1) addresses "deeper and more imponderable questions" of the meaning of life, man's role in the universe, moral issues of right and wrong, and other "ultimate concerns"; (2) contains an "element of comprehensiveness"; and (3) the "formal, external, or surface signs that may be analogized to accepted religions." *Id*. at 208-09 (Adams, J., concurring). *See also Love v. Reed*, 216 F.3d 682, 687-89 (8th Cir. 2000) (applying the *Africa* factors to determine whether inmate's vaguely Jewish beliefs and practices were "religious"); *Alvarado v. City of San Jose*, 94 F.3d 1223, 1229 (9th Cir. 1996) (adopting the test utilized in *Africa*); *Dettmer v. Landon*, 799 F.2d 929, 931-32 (4th Cir. 1986) (after considering the three *Malnak* indicia, concluding the Church of Wicca is a religion protected by the First Amendment); *Africa*, 662 F.2d at 1032 (adopting the *Malnak* factors); *Friedman v. S. Cal. Permanente Med. Grp.*, 125 Cal. Rpt. 2d 663, 679-81 (Cal. Ct. App. 2002) (adopting the objective test of religion utilized in *Africa* and *Alvarado*).

The *Myers* test closely mirrors the concurring opinion in *Malnak* and the *Africa* opinion. The defendant in *Meyers* was convicted of conspiracy to possess with intent to distribute marijuana. He filed a motion to dismiss based on religious freedoms pursuant to the First Amendment and the RFRA. To that end, he testified he was the "founder and Reverend of the Church of Marijuana and that it is his sincere belief that his religion commands him to use, possess, grow and distribute marijuana for the good of mankind and the planet earth." *Meyers*, 95 F.3d at 1479. He testified the church members pray to the marijuana plant and believe that joint smoking results in a sort of "peaceful awareness." *Meyers*, 906 F. Supp. at 1504. The district court found, and the Tenth Circuit affirmed, there was no dispute that Meyers' beliefs were sincerely held and were substantially burdened by the governmental action enforcing the drug laws. *Meyers*, 95 F.3d at 1482. The question was whether these sincerely held beliefs were "religious beliefs" or simply a "philosophy or way of life" and, thus, not subject to constitutional or RFRA protection. *Id*.

To aid in this determination, the district court reviewed numerous cases that sought to define "religion" and from those cases developed a list of five factors, along with several

additional subfactors, which the Tenth Circuit subsequently approved and adopted: (1) ultimate ideas; (2) metaphysical beliefs; (3) moral or ethical system; (4) comprehensiveness of beliefs; and (5) accoutrements of religion. As to the latter factor, the court identified ten relevant subfactors: (a) founder, prophet, or teacher; (b) important writings; (c) gathering places; (d) keepers of knowledge; (e) ceremonies and rituals; (f) structure or organization; (g) holidays; (h) diet or fasting; (i) appearance and clothing; and (j) propagation. *Id.* at 1483-84; *Meyers*, 906 F. Supp. at 1502-03. Both the district court and the Tenth Circuit emphasized that no one factor is dispositive. Instead, the factors should be viewed as criteria that, "if minimally satisfied" would suggest a set of beliefs is a "religion." *Meyers*, 95 F.3d at 1484; *Meyers*, 906 F. Supp. at 1503. [6] Moreover, the district court noted that "[p]urely personal, political, ideological, or secular beliefs probably would not satisfy enough criteria for inclusion" as a "religion." *Meyers*, 906 F. Supp. at 1504.

On appeal, the Tenth Circuit utilized the factors set forth by the district court and agreed that Meyers' beliefs were better described as a "philosophy and/or way of life" rather than a "religion":

> Marijuana's medical, therapeutic, and social effects are secular, not religious . . . . Here, the Court cannot give Meyers' "religious" beliefs much weight because those beliefs appear to be derived entirely from his secular beliefs. In other words, Meyers' secular and religious beliefs overlap only in the sense that Meyers holds secular beliefs which he believes so deeply that he has transformed them into a "religion."
>
> While Meyers may sincerely believe that his beliefs are religious, this Court cannot rely on his sincerity to conclude that his beliefs rise to the level of a "religion" and therefore trigger RFRA's protections. Meyers is, of course, absolutely free to think or believe what he wants. If he thinks that his beliefs are a religion, then so be it. No one can restrict his beliefs, and no one should begrudge him those beliefs. None of this, however, changes the fact that his beliefs do not constitute a "religion" as that term is uneasily defined by law. Were the Court to recognize Meyers' beliefs as religious, it might soon find itself on a slippery slope

---

[6] In contrast to *Meyers*, the Second Circuit Court of Appeals rejected the systematic approach to defining "religion" and instead espoused a broader, *subjective* definition, holding that for beliefs to be considered "religious" "[a]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.'" *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (quoting *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002). This, however, remains a minority position.

where anyone who was cured of an ailment by a "medicine" that had pleasant side-effects could claim that they had founded a constitutionally or statutorily protected religion based on the beneficial "medicine."

*Meyers*, 95 F.3d at 1484 (quoting *Meyers*, 906 F. Supp. at 1508).

Our review of the authority discussed above leads us to determine the indicia of religion discussed in Judge Adams's concurring opinion in *Malnak*, as articulated by the Tenth Circuit Court of Appeals in *Meyers*, presents the best method for defining what constitutes a religion for the purposes of the FERPA. We believe a *flexible* application of the objective guidelines identified in *Meyers* will enable courts in Idaho to make the often subtle distinction between a religion and a secular belief system, which may be required in applying the FERPA. To commence the inquiry, we turn to an examination of the *Meyers* factors as they apply to Cordingley's testimony regarding his "religion."

A.    ***Meyers* Factors**

1.    **Ultimate ideas**

In describing this factor, the *Meyers* court noted, "Religious beliefs often address fundamental questions about life, purpose, and death. As one court has put it, 'a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters.'" *Meyers*, 95 F.3d at 1483 (quoting *Africa*, 662 F.2d at 1032). "These matters may include existential matters, such as man's sense of being; teleological matters, such as man's purpose in life; and cosmological matters, such as man's place in the universe." *Id*. The district court in *Meyers* concluded this factor was not met:

> During his discursive testimony about his ostensible religion, Meyers never mentioned any beliefs that dealt with "ultimate concerns" such as life, purpose, and death. The "Church of Marijuana" apparently has nothing to say about profound and sublime issues such as man's sense of self, purpose in life, role in the world, existence in time, and being in space. Meyers neither mentioned nor discussed any beliefs that respond to the sorts of concerns that most other religions address: a fear of the unknown, the pain of loss, a sense of alienation, feelings of purposelessness, the inexplicability of the world, and the prospects of eternity. The Court simply was unable to discern anything ultimate, profound, or imponderable about Meyers' beliefs.

*Meyers*, 906 F. Supp. at 1505.

In *United States v. Quaintance*, 471 F. Supp. 2d 1153 (D.N.M. 2006), the United States District Court addressed this factor in the context of determining whether several defendants, who testified they utilized marijuana as part of their religious practice as members of the "Church of Cognizance," could invoke the RFRA as a defense to their charges of possession with intent to distribute the drug. The defendants testified they used marijuana as a "sacrament and deity and that the consumption of marijuana is a means of worship." *Id.* at 1155. In addressing the "ultimate ideas" prong of the *Meyers* test, the court examined Quaintance's testimony that the "purpose of life is to live a good life and help others," as well as to achieve "the longest life that you can live." *Quaintance*, 471 F. Supp. 2d at 1157. Quaintance also testified that the purpose of the church "is to try to . . . bring people around to the right way of life. . . . [T]here[] [are] two paths, the broad path through destruction and the narrow path through righteousness." *Id.* The district court concluded that although the Church of Cognizance "attempts to answer questions regarding the purpose of life" it did not believe the answers were sufficient to qualify as "ultimate ideas" within the meaning of *Meyers*. *Quaintance*, 471 F. Supp. 2d at 1157. Specifically, the court concluded there is nothing "ultimate, profound, or imponderable" about Quaintance's description of the purpose of life and that living as long as possible is a "relatively simplistic purpose confined to the physical world" as opposed to a "comprehensive, profound, inexplicable, or imponderable *religious* philosophy that addresses purpose in relationship to the spiritual or intangible world." *Id.* The court also noted that, even if the defendants' definition of the purpose of life qualifies as an "ultimate idea," their beliefs did not address other ultimate ideas identified in *Meyers*, including life and creation; fear of the unknown; the pain of loss; a sense of alienation; and the inexplicability of the world; or existential or cosmological concerns, such as an individual's existence; his place in the universe; the nature or natural order of the universe; and the origin, structure, and space-time relationships of the universe. *Quaintance*, 471 F. Supp. 2d at 1157. Finally, the court noted that although Quaintance testified as to his beliefs regarding an afterlife, he also testified that each member of the Church of Cognizance was allowed to have their own beliefs on the subject, leading the court to conclude that neither his nor the church's beliefs on the matter provided a "uniform answer to questions regarding the prospects of eternity or an afterlife." *Id.* at 1157-58. Therefore, the court concluded that because the defendants' beliefs did not address the

fundamental questions answered by most religions, their beliefs did not satisfy the "ultimate ideas" criterion. *Id*. at 1158.

Cordingley's articulated beliefs are analogously limited in regard to addressing "ultimate ideas." He testified the COCT was established as a means of "taking negatives and changing them into positives with the use of [marijuana] sacraments." He indicated the church's belief is that the purpose of the church is helping people, through the use of the marijuana sacrament, to "get back in touch with their spiritual self" so they can "spiritually connect to the universe, with their creator" and "become a better person inside." When asked whether the COCT members believe in "God" as the "ultimate creator," Cordingley indicated their primary belief is that they are "all spiritual brothers and sisters" and knowing that the use of the term "God" offends some people, they do not believe in the concept as a "singular" issue, but rather as being "the universe." Similar to *Quaintance*, even if we conclude these statements regarding the use of marijuana to become a "better" person through connecting with one's spirituality constitutes an "ultimate idea," the COCT does not appear to address any other ultimate concerns identified in *Meyers*, including life and creation; fear of the unknown; the pain of loss; a sense of alienation; and the inexplicability of the world; or existential or cosmological concerns, such as an individual's existence; his place in the universe; and the origin, structure, and space-time relationships of the universe. Put another way, aside from an abstract belief that marijuana places one "in touch with their spiritual self," the COCT does not address the fundamental questions answered by most religions. On this basis, this factor was not met.

### 2. Metaphysical beliefs

In describing this factor, the *Meyers* court stated:

> Religious beliefs are often 'metaphysical,' that is, they address a reality which transcends the physical and immediately apparent world. Adherents to many religions believe that there is another dimension, place, mode, or temporality, and they often believe that these places are inhabited by spirits, souls, forces, deities, and other sorts of inchoate or intangible entities.

*Meyers*, 95 F.3d at 1483. In considering this criterion, the district court in *Meyers* rejected the defendant's argument that his beliefs were metaphysical because smoking induced an altered state of being. *Meyers*, 906 F. Supp. at 1505. The court explained that the mere fact Meyers testified that smoking marijuana induced an altered state of being, did not mean it was metaphysical; rather, Meyers' altered state was limited to a physical and not spiritual end. *Id*.

13

He "never equated marijuana smoking with a spiritual dimension, mystical plane, or transcendent reality" and "did not assert that smoking marijuana lofts him into the realm of the religious." *Id.*

The *Quaintance* court distinguished *Meyers*, concluding the defendants presented evidence indicating they "consume marijuana to reach a spiritual end." *Quaintance*, 471 F. Supp. 2d at 1159. Specifically, the court pointed out the defendants testified they believe cannabis is a "'spiritual force that has the ability to accomplish things in the physical world,'" and it "allows a person to 'act in furtherance of . . . the agenda of the divine mind . . . sort of like thought implantation.'" *Id.* Although characterizing this evidence as "weak," the court found the defendants met the criteria, relying on the Tenth Circuit's admonition that the *Meyers* "factors should be seen as criteria that, if *minimally satisfied*, counsel the inclusion of beliefs within the term 'religion.'" *Quaintance*, 471 F. Supp. 2d at 1159 (emphasis added) (quoting *Meyers*, 95 F.3d at 1484).

Likewise in this case, Cordingley has satisfied the metaphysical requirement. He testified that, as a member of the COCT, he uses marijuana as a "sacrament" in the form of prayer to connect him to his higher power and put him in a state of spirituality. He further testified that through the use of cannabis, he becomes "spiritually enhanced" and it "elevates [him] to a process . . . . where [he] can effectively communicate with [his] God." He testified that marijuana is viewed by the COCT members as "entheogenic," meaning it "creates the spirit of God within." As a COCT minister, he utilizes the marijuana sacrament as a means to help heal people with certain mental, physical, and spiritual needs. On this basis, like the court in *Quaintance*, Cordingley at least minimally satisfied this criterion as set forth in *Meyers*.

### 3. Moral or ethical system

The Tenth Circuit explained a moral or ethical system in *Meyers* as follows:

> Religious beliefs often prescribe a particular manner of acting, or way of life, that is "moral" or "ethical." In other words, these beliefs often describe certain acts in normative terms, such as "right and wrong," "good and evil," or "just and unjust." The beliefs then proscribe those acts that are "wrong," "evil," or "unjust." A moral or ethical belief structure also may create duties--duties often imposed by some higher power, force, or spirit--that require the believer to abnegate elemental self-interest.

*Meyers*, 95 F.3d at 1483. The district court in *Meyers*, as well as the Tenth Circuit, ultimately rejected Meyers' argument that his church's motto of "Give a hand up, not a hand out" (by

14

helping alcoholics and drug addicts kick their habits) constituted a moral or ethical system. *Meyers*, 906 F. Supp. at 1505. The district court concluded that, although a laudable goal, the motto did not answer questions as to how adherents should live their lives, including what behavior is allowed and forbidden; nor did it include any commands that believers abandon their base self-interest. *Id.* at 1505.

Here, when asked whether the COCT teaches its members how to behave in society and whether the church has a code of conduct, Cordingley answered in the affirmative. When asked what happens to a member of the church if they violate the code of conduct, he answered:

> It depends upon the severity of it. We usually give the person the choice of what they think they need to do. Then, as a board of directors, we decide because there's a lot of people that try to use it as a scapegoat.
> People try to--even in Oregon, a man came across our website and tried to use it as a means of defense, but he tried to use it after the fact that, you know, he had been arrested.

From this record, Cordingley did not present evidence sufficient to indicate the COCT ascribes to a moral or ethical standard as defined by *Meyers*. There is simply no evidence for us to evaluate because, although Cordingley indicated the COCT has a code of conduct, he did not elaborate further, and we are, therefore, unable to ascertain the nature of this code.[7]

### 4. Comprehensiveness of beliefs

As to the comprehensiveness of beliefs factor, the Tenth Circuit stated:

> Another hallmark of "religious" ideas is that they are comprehensive. More often than not, such beliefs provide a *telos*, an overreaching array of beliefs that coalesce to provide the believer with answers to many, if not most, of the problems and concerns that confront humans. In other words, religious beliefs generally are not confined to one question or a single teaching.

*Meyers*, 95 F.3d at 1483. Based on the monofaceted nature of the defendant's beliefs in *Meyers*, which was focused entirely on the use of marijuana, the district court held his beliefs were not comprehensive: "There is nothing comprehensive about Meyers' beliefs. He worships a single plant; as he put it, the marijuana plant is 'the center of attention.' . . . Indeed, as the Court sees it,

---

[7]    We do note that from the context of Cordingley's testimony, it appears the code of conduct to which he was referring pertained to members' handling of the marijuana sacrament. If so, this would almost certainly not amount to the establishment of a moral or ethical system as contemplated in *Meyers*.

15

it would be difficult to conceive of a more monofaceted 'religion.'" *Meyers*, 906 F. Supp. at 1506.

The *Quaintance* court similarly concluded the defendants' beliefs were so singularly focused on the use of marijuana that they were not "comprehensive" within the meaning of *Meyers*, pointing out testimony that the "central tenet" of the Church of Cognizance was consuming marijuana. *Quaintance*, 471 F. Supp. 2d at 1162. In addition, the *Quaintance* court concluded the defendants' beliefs could not be considered comprehensive because they were not uniform. *Id*. Specifically, the court pointed out that each member of the Church of Cognizance was entitled to adopt his or her own individual beliefs and concluded that a "set of beliefs cannot be comprehensive if the sole shared belief concerns marijuana." *Id*. "Defendants' singular belief in the power of marijuana (even if that belief allegedly provides Defendants with a comprehensive set of answers to life's problems)," the court surmised, "is insufficient as a matter of law to constitute a 'comprehensive' set of religious beliefs." *Id*. at 1163.

Cordingley's testimony makes clear the beliefs of the COCT are strikingly similar to the beliefs addressed in both *Meyers* and *Quaintance* in terms of being singularly focused on the consumption of marijuana. As mentioned above, Cordingley testified he created the ministry for the purpose of "taking negatives and changing them into positives with the use of entheogenic sacraments."[8] When asked whether he could exercise his religion without the use of cannabis, Cordingley answer in the negative, stating the church is "*designed specifically* for the use of entheogenic sacraments to help us get in touch with our spiritual self, in order to obtain enlightenment." (Emphasis added.) Cordingley further testified the reason one would join the COCT would be to use marijuana as a sacrament and participation in the church would be "pointless" without the use of marijuana. The role of the COCT as singularly based on the use of marijuana was further made clear by Cordingley's testimony that the COCT is a "companion" to the individual faith structures of each member (using the examples of Buddhists and members of the LDS church), where each member pursues his own faith, but members are united through their use of marijuana under the auspices of the COCT. Cordingley described no other beliefs, practices, sacraments, or the like that did not pertain to the use of marijuana. The COCT's

---

[8]     The only "entheogenic" sacrament identified by Cordingley in the entirety of his testimony was marijuana.

16

singular focus on the use of marijuana is insufficient as a matter of law to constitute a "comprehensive" set of religious beliefs as defined in *Meyers*. *See Quaintance*, 471 F. Supp. 2d at 1163.

### 5. Accoutrements of religion

In describing the final factor, which is comprised of ten subfactors, the Tenth Circuit explained, "By analogy to many of the established or recognized religions, the presence of [various] external signs may indicate that a particular set of beliefs is 'religious.'" *Meyers*, 95 F.3d at 1483. We address each in turn.

#### a. Founder, prophet, or teacher

"Many religions have been wholly founded or significantly influenced by a deity, teacher, seer, or prophet who is considered to be divine, enlightened, gifted, or blessed." *Id*. In evaluating this criterion, the district court in *Meyers* explained:

> Although Meyers founded the church in 1973, he does not claim he alone possessed the kind of spiritual wisdom, ethereal knowledge, or divine insight that often leads to the founding of a religion. Meyers calls himself a "Reverend" of the church, but does not assert that he alone is fit for that role, and does not contend that he is divine, enlightened, or gifted. The Church of Marijuana apparently has no founder or teacher similar to an Abraham, Jesus, Mohammed, Buddha, Confucius, Krishna, Smith, or Black Elk.

*Meyers*, 906 F. Supp. at 1506.

Cordingley's testimony in this case was somewhat ambiguous. Like Meyers, Cordingley testified he founded the church, but did not claim he alone possessed any particular insight. In addition, Cordingley also calls himself a "Reverend" of the COCT, but did not assert that he alone is fit for the role, or that he is "divine, enlightened, or gifted" in any special manner as the founder of a religion. When asked who he considered to be the "founder or the prophet or the teacher" of his religion, he answered that it was "Jesus Christ." From the context of his testimony as a whole, however, he seemed to be stating that since he considered himself a Christian as well as a member of the COCT, Jesus Christ is the founder of his brand of religion as opposed to being the founder of the COCT specifically, which was Cordingley himself. On this basis, Cordingley did not satisfy this subfactor.

#### b. Important writings

"Most religions embrace seminal, elemental, fundamental, or sacred writings. These writings often include creeds, tenets, precepts, parables, commandments, prayers, scriptures,

catechisms, chants, rites, or mantras." *Meyers*, 95 F.3d at 1483. In *Meyers*, the district court concluded the book Meyers asserted was his "bible" did not qualify as a sacred writing for the purpose of this subfactor because it was merely a collection of information on marijuana, without purporting to be a sacred text and bearing no resemblance to recognized religious works that touch upon "lofty or fundamental issues." *Meyers*, 906 F. Supp. at 1507.

Here, Cordingley testified that "the Bible and all sacred writings and text" constituted his religion's "important writings." He further stated the Bible supports his use of marijuana as a sacrament, but he did not expand on this point in any meaningful respect. In addition, Cordingley has referenced his "religion" as Rastafarianism, which he in no way ties to the Bible. Further, members of the COCT include atheists, who are clearly not Bible-based. Cordingley's reference to his companion use of the Bible does not make it an important writing for his asserted religion or church; therefore, he has not met this factor.

### c. Gathering places

"Many religions designate particular structures or places as sacred, holy, or significant. These sites often serve as gathering places for believers. They include physical structures, such as churches, mosques, temples, pyramids, synagogues, or shrines; and natural places, such as springs, rivers, forests, plains, or mountains." *Meyers*, 95 F.3d at 1483. In evaluating this criterion, the district court in *Meyers* explained:

> Although the Church of Marijuana apparently has a building of some sort at which members gather to smoke marijuana, Meyers did not assert that the building was in any way holy, sacred, or significant. The building in which church members gather apparently has no larger significance to them, as might a synagogue, mosque, temple, or shrine.

*Meyers*, 906 F. Supp. at 1507.

Similarly in *Quaintance*, the court found this subfactor was not satisfied where the Church of Cognizance had no official gathering place for its members, but rather each member's residence was considered an individual place of worship. *Quaintance*, 471 F. Supp. 2d at 1166. Here, Cordingley testified that the COCT has "all kinds of different gathering places" and they gather every other Sunday at a different place. He indicated it was not necessary to have a building to "introduce [the] sacrament to [his] believers." Like the churches in *Meyers* and *Quaintance*, the COCT does not have a particular gathering place imbued with meaning, and this subfactor is not met.

18

### d.    Keepers of knowledge

"Most religions have clergy, ministers, priests, reverends, monks, shamans, teachers, or sages.  By virtue of their enlightenment, experience, education, or training, these people are keepers and purveyors of religious knowledge."  *Meyers*, 95 F.3d at 1483.  In *Meyers*, although the defendant asserted he was a "Reverend" in the Church of Marijuana, he did not testify as to how he obtained this position, how or if he was qualified (*i.e.,* through special training, experience, or education), or about any special duties he had as a result of his position.  On this basis, the *Meyers* district court concluded this subfactor was not met.  *Meyers*, 906 F. Supp. at 1507.

In *Quaintance*, the court also found the subfactor was not met, determining there could not be keepers of knowledge in the Church of Cognizance because there was no uniform set of knowledge to keep and even though the defendants testified they were such keepers of knowledge, they had no special duties and did not provide any special teaching or guidance.  *Quaintance*, 471 F. Supp. 2d at 1167.  Here, Cordingley testified that as one of the "keepers of knowledge" in the COCT, he was responsible for the spiritual welfare of his congregation, introducing others to the church, and explaining the tenets of the church.  As a minister, he was also imbued with the responsibility to carry and administer the sacrament.  But as in *Quaintance*, there is no uniform set of knowledge for which Cordingley is the keeper.  While he may explain the tenets of the church, this has nothing to do with religious knowledge, only how the COCT works and its use of the sacrament for these beliefs.  This subfactor is not met.

### e.    Ceremonies and rituals

"Most religions include some form of ceremony, ritual, liturgy, sacrament, or protocol.  These acts, statements, and movements are prescribed by the religion and are imbued with transcendent significance."  *Meyers*, 95 F.3d at 1483.  The *Meyers* district court concluded that because the Church of Marijuana only has one ceremony or ritual, "to smoke and pass joints," and had no services, prayers, liturgy, sacraments, or blessings such as baptism or marriage, this subfactor was not met.  *Meyers*, 906 F. Supp. at 1507.  Likewise in *Quaintance*, the district court found this subfactor was not met, noting the Church of Cognizance had only one ceremony or ritual--the consumption of the "sacrament" of marijuana--which was not accompanied by any ceremony or ritual; rather, members were allowed to worship through the use of the sacrament any time they wanted, individually.  *Quaintance*, 471 F. Supp. 2d at 1168.

19

Cordingley's testimony established the COCT can be distinguished from the churches in *Meyers* and *Quaintance* in this regard. Cordingley identified the "sacrament" as a ritual (which includes prayer) that members engage in during their bi-weekly meetings. Also, in addition to using marijuana in his own personal daily prayer, Cordingley also described the rituals surrounding the actual administration of the "sacrament" to those in "any time of need." Specifically, the sacrament is placed in a chalice, the minister raises it above his head, thanks God for the sacrament and the comfort it provides, and prays it will bring comfort to the afflicted person. He also indicated that, as a minister in the COCT, he performs marriages and the church performs baptisms with "holy anointing oil which is fire baptism." Cordingley has presented evidence that we will assume for this analysis satisfies this subfactor.

### f. Structure or organization

"Many religions have a congregation or group of believers who are led, supervised, or counseled by a hierarchy of teachers, clergy, sages, priests, etc." *Meyers*, 95 F.3d at 1483. In evaluating this subfactor, the district court in *Meyers* noted the Church of Marijuana had approximately 800 members, twenty of whom were considered "teachers." *Meyers*, 906 F. Supp. at 1507. Although Meyers did not explain what the teachers did, giving him the "benefit of the doubt," the court assumed that as the "Reverend" of the Church of Marijuana, Meyers was the foremost church member and the teachers were immediately below him. *Id*. In *Quaintance*, on the other hand, the court concluded this subfactor was not met because the Church of Cognizance was comprised of independent entities entitled to adopt their own beliefs and although the church had "enlightened cognoscenti," the members of the church are not led, supervised, or counseled by any of these cognoscenti. *Quaintance*, 471 F. Supp. 2d at 1168.

Here, Cordingley testified that each COCT congregation consists of five to twenty members who are overseen by a minister.[9] The COCT's leadership consists of the president (Cordingley), a vice president, and a secretary. Cordingley testified he was responsible for the spiritual welfare of his congregation, introducing others to the church, explaining the tenets of the church, and carrying and administering the sacrament. Given the testimony as to structure and leadership, we will again assume that Cordingley has minimally satisfied this subfactor.

---

[9] There is no evidence in the record as to how many total members belong to the COCT.

### g. Holidays

"As is etymologically evident, many religions celebrate, observe, or mark 'holy,' sacred, or important days, weeks, or months." *Meyers*, 95 F.3d at 1483. Cordingley testified that members of the COCT celebrate all major holidays, including Christmas and Easter, as well as a Hindu holiday, a Rastafarian holiday, and Earth Day. However, there is no testimony as to how these holidays relate in any way to Cordingley's religion or tenets of the COCT. There is no testimony that practitioners of the religion or members of the COCT accept the basis for such holidays. Again, certain members, by definition, do not recognize Christian holidays. Accordingly, this subfactor is not met.

### h. Diet or fasting

"Religions often prescribe or prohibit the eating of certain foods and the drinking of certain liquids on particular days or during particular times." *Id.* Cordingley testified that ministers are required to fast and pray, usually for a day, prior to preparing "holy anointed oil." He did not testify as to any particular diet or fasting prescribed incident to religious beliefs separate from a minister's preparation of a sacrament. In other words, diet or fasting is not a religious belief of members of the religion or church. Even so, we will assume for this analysis that this subfactor is minimally met.

### i. Appearance and clothing

"Some religions prescribe the manner in which believers should maintain their physical appearance, and other religions prescribe the type of clothing that believers should wear." *Id.* at 1483-84. Cordingley testified there was no prescription as to the type of clothing believers should wear, and thus, this subfactor is not met.

### j. Propagation

"Most religious groups, thinking that they have something worthwhile or essential to offer non-believers, attempt to propagate their views and persuade others of their correctness. This is sometimes called 'mission work,' 'witnessing,' 'converting,' or proselytizing." *Id.* at 1484. We can ascertain no evidence in the record as to this subfactor, and thus, it is not met.

## B. Summary

Upon examination of the *Meyers* factors as they apply to this case, Cordingley has not satisfied his burden. On one hand, it may be said that to some degree the COCT is comprised of a structure containing some of the "accoutrements of religion" as we assumed above. In this

regard, the COCT is distinguishable from the churches in cases where courts have found the free-for-all nature of the church's practices a significant factor in coming to the conclusion they did not constitute a statutorily recognized "religion." *See State v. Pedersen*, 679 N.W.2d 368, 376 (Minn. Ct. App. 2004) (noting the defendant's marijuana use was not "a communal religious belief"); *State v. Brashear*, 593 P.2d 63, 68 (N.M. Ct. App. 1979) (noting there was no evidence the defendant's asserted religious belief in using marijuana was espoused by any organization or was a principle, tenet, or dogma of any organization of which he was a member). In addition, the COCT espouses beliefs surrounding the use of marijuana considered "metaphysical" in that they involve prayer and, for some members, a belief in "God." On the other hand, however, Cordingley has clearly failed to meet at least three of the five overall factors, including the question of whether the COCT addresses "ultimate ideas," has a "moral or ethical system," and the "comprehensiveness of beliefs."[10] Most glaringly, the COCT is singularly focused on the use of marijuana to a degree that has consistently been found not to be indicative of statutorily recognized religious practice. We also note Cordingley's testimony, where he appeared to take pains to distinguish the COCT as a means of spirituality rather than a "religion" itself:

> [Cordingley]: But the main factor is helping people to get in touch with their spiritual self to understand we are all children, you know, of the universe in a spiritual way.
>
> So it connects us not just on a level here but on a level--so as far as, you know, Buddha, Rasta, Hindu, Christian--*we all rise above the religious level*, which is the secular level, and intermingle as spiritual brothers and sisters.
>
> So we leave discrimination and prejudice by the wayside. A lot of times, with religion, they tend to be more prejudiced or discriminatory if you don't want to be a part of the religion or this or that.
>
> You can't play with them. You can't marry them. And it shouldn't be that way. We should all be able to interconnect with one another spiritually.
>
> So that's what the Church of Cognitive Therapy is about. It's about teaching people that they are spiritual human beings. *And it's a companion to religion, whatever religion you are.*
>
> It would be, you know, a means of discovering your spirituality because a lot of people who go to church just, frankly,

---

[10]  As noted, Cordingley minimally satisfied some of the accoutrements of religion subfactors.

22

aren't spiritual human beings. They are there for the religion, to be seen by everybody else. It's more of a secular deal.

That's where this conflict has arisen is whether they are secular beliefs or whether they are, you know--religion, quite frankly, directly comes from, you know, the secular community.

So there is a lot of definitions that need to be rewritten. *Religion versus spirituality.* You know, on the spiritual sense, there's a need, you know, for people to get in contact with their spiritual self, *above the religious part.*

[The Court]: So even within your community, there are those with certain types of so-called mainstream religions--Rasta, Buddhists, Christian.

*But many others are simply willed as spiritual beings with no defined preference towards a religion.*

[Cordingley]: Correct.

. . . .

It's called a collective consciousness, ultimately, as far as consciousness, if you will--

. . . .

--where people get spiritually to a certain level to where, you know, they communicate beyond the need for, I guess you would say, a structured, religious-type atmosphere--

. . . .

--because some people, quite frankly, need that structure to tell them what to do.

. . . .

Some people don't take upon themselves, you know, the ability to go out and study sacred texts or cultures or forms of religion and spirituality. It didn't just come to this, you know, overnight.

I have been studying my whole lifetime. You know, *spirituality is what took me out of religion.*

(Emphasis added.) It is clear from this discussion that Cordingley repeatedly distinguished the COCT from the typical religious structure, going as far as to claim it is not a religion itself, but rather an accompaniment to members' other self-contained religious beliefs (or nonbelief since those who do not ascribe to other religious beliefs are welcome). Although Cordingley's own characterization of the COCT is not dispositive, it does provide valuable insight into the nature of the church. Despite evidence that the COCT has religious aspects, we agree with the magistrate and district court and are not convinced it amounts to the practice of a "religion" protected by the FERPA. As Cordingley testified, the COCT's sole purpose is to facilitate the

23

use of marijuana, as an accompaniment to a member's other religious (or nonreligious) beliefs, and we do not believe this is analogous to the practice of "religion" intended to be protected by the Act.[11]

## III.

## CONCLUSION

Cordingley fails to show his use of marijuana as a member of the COCT comprises an exercise of "religion" such that it is protected by the FERPA. Accordingly, we conclude the magistrate did not err in determining Cordingley did not carry his burden to show his use of marijuana was "religious." Therefore, we affirm the district court's decision, on intermediate appeal, affirming the magistrate's denial of Cordingley's motion to dismiss the possession of marijuana and paraphernalia charges.

Judge LANSING and Judge GRATTON **CONCUR.**

---

[11] Various courts have analyzed the issue and concluded that a blanket ban on "any place/any time" marijuana use is the least restrictive means. The Arizona Supreme Court has a good analysis of this issue in *State v. Hardesty*, 214 P.3d 1004, 1009 (Ariz. 2009). However, there are insufficient facts in the record to reach this issue as neither lower court addressed it in their decision, the facts needed for analysis were not developed on the record, and it was not sufficiently briefed by the parties on appeal.